PATRICIA BARBOSA (SBN 125865)
AYMAN MOURAD (SBN 304161)
**BARBOSA GROUP**
8092 Warner Avenue
Huntington Beach, CA 92647
Tel: (714) 465-9486
Fax: (866) 907-3235
PBarbosa@barbosagrp.com
Amourad@barbosagrp.com

Attorneys for Plaintiff,
AURELIANO GALVEZ

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AURELIANO GALVEZ,<br><br>               Plaintiff,<br><br>vs.<br><br>AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA; THE AMERICAN AUTOMOBILE ASSOCIATION, INC.; AUTO CLUB SERVICES, LLC., and DOES 1 through 10, inclusive,<br><br>               Defendants. | Case No.: 8:16-cv-887<br><br>**Civil Rights**<br><br>COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES: DENIALS OF DISABLED ACCESS TO PUBLIC ACCOMMODATIONS<br>1. Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*;<br>2. Unruh Civil Rights Act, Cal. Civ. Code § 51 *et seq.*;<br><br>**DEMAND FOR JURY TRIAL** |

    Plaintiff AURELIANO GALVEZ complains of Defendants AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA, THE AMERICAN AUTOMOBILE ASSOCIATION, INC., AUTO CLUB SERVICES, LLC and DOES 1 through 10, inclusive, and alleges as follows:

ADA TITLE III: COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Case No.:                                                                                          1

# I. INTRODUCTION

1.      The American Automobile Association, Inc., and the Autoclub of Southern California, "AAA," as its members and Defendants refer to their organizations, aggressively advertise their 24-7 emergency roadside assistance ("ERS") services to their members in Southern California.  While boasting of serving 6 million members, AAA has failed to make reasonable accommodations, or to modify discriminatory ERS policies to ensure that their goods and services are provided to disabled members in a full and equal manner. Specifically, AAA solicits and accepts membership from disabled members who due to their disability cannot transfer into a regular tow truck if their cars break down on the road.  On information and belief, AAA fails to inform disabled members that unless they can independently transfer into a regular tow truck, they will be pressured to seek help from third parties if their vehicles must be towed.  The reason AAA fails to provide transportation services to disabled members is because AAA has only two accessible tow trucks companies it uses to service all disabled members from Fresno to San Diego.  The actual policy used by AAA is to pressure disabled members to ask friends or family to pick them up from the break down.  While representing to the public that AAA offers disabled members the use of accessible taxis or other alternative transportation, the actual practice if a disabled member is not able to find someone to pick them up, is to offer the member the phone number of public "paratransit" services to seek a pick up.  AAA offers paratransit numbers to disabled members, even though it has knowledge that paratransit is a government transportation service for disabled persons who cannot use public transportation, and is for shared rides based on reservations. Arranging for only two accessible tow trucks available for use by 6 million members from Fresno to San Diego demonstrates a complete failure to modify their towing services to provide useable, and accessible transportation to disabled members.  Asking disabled members in dire circumstances to call paratransit services, when Defendants

know that this government services is not available to pick up AAA members during a breakdown is, knowing, willful, and intentional misrepresentation to disabled members of the ERS services they can expect from AAA if their cars break down.

2.    Plaintiff AURELIANO GALVEZ ("Plaintiff") is one of AAA's disabled members who after 12 years of membership discovered that while all other AAA members are provided prompt, and usable transportation when their cars are towed, disabled members are told to make their own arrangements for transportation, or offered unusable options that leave them to make their own arrangements or risk being left stranded.  The false promise of accessible services injures persons with disabilities such as Plaintiff who rely on these services on the expectation that 25 years after the passage of the ADA, these services will be accessible to them as disabled persons.

3.    However, even though these Defendants have been arguing since 2014 in two separate and unrelated lawsuits that AAA policy is to provide disabled members with accessible transportation when necessary, both of the two incidents described by Plaintiff Galvez took place after AAA supposed policy revisions, and one as late as January 2016. (See, *Rudder v. Automobile Club of Southern California, et al,* 8:14-cv-00247-DOC-KES; *Rudder v. Automobile Club of Southern California, et al*, 8:15-cv-01469-DOC-JCG)  Plaintiff Galvez, who is paralyzed and a long-time AAA member, makes the same allegations as those made by an unrelated plaintiff in the two prior lawsuits—disabled members are denied safe, prompt transportation when their cars break down because of AAA's failure to accommodate their needs as disabled members.

4.    For individuals like Plaintiff, who require the use of a wheelchair for mobility, run of the mill car problems or requests for roadside assistance create a different dimension of danger, difficulty, and uncertainty if they are not provided with wheelchair accessible transportation services.  Without access to equal benefits and access to the services they expect, disabled members such as Plaintiff can find themselves

ADA TITLE III: COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Case No.:                                                                                                    3

stranded for long periods of time, often in dangerous situations, and subject to perilous traffic conditions or local crime.  Accessible transportation for disabled persons stranded with broken cars, is a benefit of membership that cannot be denied on the basis of disability.  Unequal benefits for disabled persons can be the difference between a minor inconvenience on a highway, and an extremely dangerous tow on the back of a tow truck, long delays using public transportation, and being forced to ask friends or family for help.  These issues are not merely matters of convenience or preference; they can lead to life-threatening situations, extreme anxiety, and fear for disabled persons that they will be left stranded.

## II. JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 for violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear and determine Plaintiff's state law claims because they are related to Plaintiff's federal claims and arise out of a common nucleus of operative facts.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and is founded on the fact that Plaintiff's causes of action arose in the Central District of California.

## III. PARTIES

7.      Plaintiff AURELIANO GALVEZ ("Plaintiff") is a qualified individual with a physical "disability." As defined under the ADA (42 U.S.C. § 12101 *et seq.*); Department of Justice regulation 28 C.F.R. § 36.104 and California Government Code § 12926.  In 1996 Plaintiff was the victim of violence, which left him permanently paralyzed.  A bullet struck him in 1996 and caused a T-12 spinal injury, resulting in complete paraplegia.  Plaintiff is unable to independently stand or walk and must use a wheelchair for mobility.  He is unable, due to his physical disability, to transfer in and out

of a tow truck that is not modified for wheelchair users. On information and belief, Defendants have failed to accommodate their disabled members and ensure their ERS is usable and accessible to disabled members who cannot independently transfer into tow trucks with higher profiles, such as Plaintiff.  At all times relevant hereto, Plaintiff has been and is currently a resident of California.  At all times relevant to this action, Plaintiff has been a paid member of the AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA and, on information and belief, has received services directly or indirectly from each of the named Defendants.

8.     On information and belief, Defendants AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA; THE AMERICAN AUTOMOBILE ASSOCIATION, INC.; AUTO CLUB SERVICES, LLC. and DOES 1 through 10 ("Defendants"), inclusive are, and at all times relevant herein were, the owners, and operators of public accommodations, in which they offer services to its members which include, registration of automobile, auto and personal insurance, travel agent assistance, and driving maps. Defendant ACSC also operates call centers which handle the ERS 24-hour emergency roadside calls, which includes dispatching towing services for vehicles and transportation for stranded members.  Defendants offer these services in places of public accommodation all over Southern California, online on their website, through their emergency roadside assistance call centers, and through the use of independent tow truck operators who operate out of garages throughout Southern California, and who provide services to members on the road.

9.     On information and belief, Defendant THE AMERICAN AUTOMOBILE ASSOCIATION, INC. ("AAA") is a multistate organization comprised of multiple smaller automobile clubs throughout the United States, including Defendant AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA ("ACSC"), and who sets the standard for AAA services to member automobile clubs.  On information and belief,

ACSC operates its business and provides services for its members in the AAA regions known as "Southern California," from the border of Mexico in San Diego to just south of Fresno. ACSC operates dozens of physical offices throughout the Southern California region, where the public can go to become a member of the organization, and utilize their available services, including, but not limited to, purchasing life and automobile insurance, booking travel arrangements, registering vehicles, notary services, and other AAA services.

10. On information and belief, Defendant AUTO CLUB SERVICES, LLC. ("ACS") is a wholly owned subsidiary of ACSC. On information and belief, ACS owns and operates several out-of-state Auto Clubs on behalf of ACSC. On information and belief, ACS operates and provides emergency roadside assistance telephonic services for ACSC members in Southern California.

11. Defendants operate a "place of public accommodation" as defined under 42 U.S.C. § 12181(7)(E) and 28 C.F.R. § 36.104, and are "business establishments" covered under California Civil Code §§ 51 *et seq.*

12. Plaintiff is currently unaware of the true identities of DOES 1-10, who may be necessary parties to this action, and will seek the Court's leave to amend when their true names, capacities, connection, and responsibilities are ascertained.

13. Plaintiff is informed and believes that each of the Defendants is the agent, ostensible agent, alter ego, master, servant, trustor, trustee, employer, employee, representative, franchiser, franchisee, lessor, lessee, joint venture, parent, subsidiary, affiliate, related entity, partner, and/or associate, or such similar capacity, of each of the other Defendants and was at all times acting and performing, or failing to act or perform, within the course and scope of such similar aforementioned capacities, and with the authorization, consent, permission, or ratification of each of the other Defendants and is individually responsible in some manner for the acts and omissions of the other

Defendants in proximately causing the violations and damages complained of herein, and have participated, directed, and have ostensibly and/or directly approved or ratified each of the acts or omissions of each of the other Defendants, as herein described.

### IV. FACTS UPON WHICH ALL CLAIMS ARE BASED

14.    Plaintiff and his mother have been members of the ACSC and AAA for twelve years, with towing and ERS included in their membership.  Prior to August 2015, Plaintiff had never required ERS that included having his vehicle towed by Defendants independent towing companies.  Plaintiff remains a member in good standing with ACSC, continues to drive a vehicle, and will require the services of Defendants in the future.

### Facts of the August 17, 2015 Incident

15.    Defendants provide services to assist motorists when their vehicles break down or are damaged as part of their membership privileges.  One of Defendants' primary functions is to provide emergency roadside assistance to members, which may include towing their vehicles to repair shops or other safe locations, and transporting their stranded members along with the vehicles.  Unless a member does not wish to ride in the tow trucks, members ride along with their cars to the towing destination.

16.    However, for wheelchair users like Plaintiff who cannot physically transfer himself into the tow truck, the choices are not the same.  On information and belief, Defendants instruct the employees at the call centers to ask if friends or family can pick up the member if the member need accessible transportation.  If the member is not able to find someone to help them, they are offered the phone number of the local government-run paratransit service.  On information and belief, Defendants are aware that a government-run paratransit service requires pre-registration for eligibility, is a shared ride option, is not door to door, but curb-to-curb, and generally requires at least 24-hour notice to schedule.  On information and belief, Defendants also represent that they offer

an accessible taxi, but have not evaluated the number of accessible taxis serving the ACSC region, or their availability to emergency pick-ups. Finally, Defendants offer disabled members the choice of riding in their car while it is being towed, with the knowledge that the members may risk injury during the ride. On information and belief, Defendants' represented policies or paying for accessible taxis or paratransit for the members is without any factual basis such as evidence of payment for accessible taxis, or paratransit services. On information and belief, disabled members such as Plaintiff and other similarly situated wheelchair users, are given the choice to be left stranded, forced to make alternative transportation arrangements, or are only given the option to ride in their vehicles during the tow.

17.     On August 17, 2015, Plaintiff was travelling south on the 710 Freeway. He was driving in the far left lane when one of his tires blew out. Plaintiff had to move to the inside shoulder to safely stop his car on the busy freeway. He parked the car with the driver's door as close to the median barriers as possible to avoid being hit by a passing car in the fast lane. He then immediately called the Defendants' ERS phone line to explain his problem and request help to get him and his car off of the freeway. Plaintiff explained to the operator that he was in a wheelchair and would require a wheelchair accessible means of transportation. Plaintiff did not know at this time how Defendants accommodated disabled members during ERS calls who could not transfer into a tow truck. Plaintiff assumed that if he told them he was in a wheelchair then Defendants would be able to accommodate him, even with his disability. Plaintiff does not recall the ERS telephone operator asking him any questions about his need for accommodations after he told her he was disabled and in a wheelchair. Although Plaintiff had been a member for 12 years, he had not needed to be towed prior to this incident and did not know Defendants' policies or procedures, other than their representation that he would be provided ERS services if he broke down. Defendants asked him if friends or family

ADA TITLE III: COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Case No.:                                                                                    8

could pick him up, but Plaintiff did not want his wife to attempt to pick him up on the freeway for her safety. He believed it would be too dangerous for any friend or family to help him out of his car on a busy freeway. Plaintiff wanted his AAA membership privileges to be honored and for Defendants to provide him the emergency services they offered all able-bodied members.

18.     A member of the California Highway Patrol ("CHP") arrived and closed off the lane closest to the inner shoulder to help ensure Plaintiff's safety while he waited for a tow truck. On information and belief, CHP does not provide towing services to drivers, but does help to ensure their safety while the drivers seek help. The CHP officer did not offer Plaintiff any assistance to get off of the freeway, and knew from Plaintiff that he was waiting for AAA to help him.

19.     Defendants' independent ERS service provider arrived shortly after the CHP. However, he arrived in a regular truck, not a tow truck, and certainly not an accessible truck. The driver came to Plaintiff's car and asked Plaintiff to get out of the car, so he could tow the car. Plaintiff explained that he was in a wheelchair and could not get out of his car on the freeway in his wheelchair. On information and belief, although Plaintiff clearly informed the ACSC dispatcher that he was disabled and needed assistance as a wheelchair user, the call center did not inform the towing company or the truck driver that Plaintiff was disabled and was in a wheelchair. Plaintiff explained that he could not stand up, or transfer from his wheelchair into a truck with a high cab. On information and belief, the truck driver called his dispatcher to let them know he could not help Plaintiff because he was in a wheelchair and could not transfer into his truck. The driver informed the Plaintiff that the dispatcher would send another tow truck to assist Plaintiff. Plaintiff understood that since he had informed the call center operator, and the tow company driver, that he could not transfer into a high cab, that they would send someone who could assist him in his wheelchair.

ADA TITLE III: COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Case No.:                                                                                      9

20.     Defendants did not send an accessible tow truck, or call to ask him how they could best help him.  A flatbed tow truck arrived on scene with an inaccessible tow truck that Plaintiff could not transfer into from his wheelchair.  The new tow truck driver went up to Plaintiff and asked him to get out of his car so he could tow it.  Plaintiff then realized that Defendants had no policies to assist him as a disabled member and that the new driver had not even been told he was in a wheelchair and had no idea how to safely get him off the freeway.  Frustrated, he asked the driver how they were going to transport him to the repair shop.  The truck drivers suggested Plaintiff could wait at the shoulder of the freeway in his wheelchair until a friend or family member could come and pick him up.  Plaintiff became very worried that the drivers might leave him on the freeway if he got out of the car and allowed them to tow his car without him.  Although Plaintiff did not tell the truck drivers that he had anyone to come and pick him up on the freeway, the truck drivers did not offer him any alternative to get off the freeway, and they did not call the dispatcher to ask for assistance to get Plaintiff off the freeway.  On information and belief, although Defendants have represented that they offer alternative transportation for disabled members, Defendants employees and independent service contractors do not know or do not offer any alternative transportation other than asking help from friends or family.  Plaintiff was very concerned he would be left stranded on the freeway and refused to exit his car so they could not leave him stranded.

21.     When Plaintiff refused to get out of his car, the flatbed tow truck driver offered to do Plaintiff a "favor" and tow him while he was still in his car.  Plaintiff did not think he had any choice but to accept the "favor" or risk being left stranded on the freeway in his wheelchair.  Plaintiff reluctantly agreed to stay in his car while being towed because was offered no other choice, and he was in a dangerous situation.  On information and belief, although towing a disabled member off a busy freeway may require the member being to be towed in his car, this emergency transportation is not

acceptable once off the freeway and out of danger.  Plaintiff was not given the choice of being towed in his car until he was safely off freeway, and then offered accessible transportation to the repair shop. On information and belief, Defendants represent that they tow disabled members in their cars only in emergency situations, such as getting disabled members off the freeway, but not for general towing.

22.     The flatbed truck driver lifted Plaintiff's car on the back of the tow truck with Plaintiff in it, and drove off the freeway.  Plaintiff was towed in his car to the repair shop.  While being towed his car shook violently, forcing Plaintiff to hold onto the steering wheel to keep from being injured by the hard jarring.  Plaintiff tried to contact the tow truck driver by honking his horn to let him know that he needed help, but the tow truck driver either did not hear the horn or ignored it.

23.     Plaintiff's condition affects his lower extremities, including his bladder control.  Plaintiff needed to use the restroom urgently due to the violent jarring and shaking of being towed.  He tried to get the tow truck driver's attention to let him know that he needed help, but could not get his attention. Plaintiff uses a catheter in case of an emergency where he can't find an accessible restroom.  But in this situation, he could not let go of the steering wheel to use his catheter because he was shaking violently and was worried of falling out of his chair or getting injured.   Plaintiff lost control of his bladder and had urinary accident while he was being towed.  Plaintiff had to remain in his soiled seat during the trip to the repair shop.  He suffered extreme embarrassment and emotional distress due to this incident.

24.     The flatbed driver towed Plaintiff on his flatbed to a tire shop to repair his car.  Plaintiff was extremely dissatisfied with being towed on the top of a flatbed, like cargo, when he knew able-bodied members were provided with useable transportation in a tow truck when they call for emergency roadside assistance.  He knew that he did not receive the equal benefits and services he expected, because he was a disabled member

and Defendants did not make provisions to provide him with useable, accessible transportation during ERS calls.  Although very unhappy with the service he received, Plaintiff decided not to file a complaint with AAA because he believed the tow truck driver had done him a "favor" and he did not want to cause problems for the truck driver. He believed that being towed while in his car, was a very rare occurrence that was not part of Defendants' policy for serving disabled members.

### Facts of the January 2016 Incident

25.     In mid- January 2016, Plaintiff was about to return home from work when he found out his car would not start.  Plaintiff called AAA for assistance.  He was unsure of the problem, and first asked Defendants to bring gas for his car.  After they refilled his tank, his car still would not start.  Plaintiff, who does his own repairs when possible, realized he needed to tow his car to home to repair it.  He called the Defendants' to request a tow, but the operator informed him that he had reached the maximum number of towing miles on his policy. While Plaintiff refuted this response, he was worried because he was in an unsafe neighborhood, where neither he or his car would be safe if left alone. Plaintiff then used his mother's membership card to request a tow, but was told his mother had to come to the location to use the card.  Plaintiff called his mother, who does not drive alone at night, and told her to find someone to come and use her AAA card.  His mother agreed, but again, Plaintiff did not want to stress his mother, or ask that she find someone who could take him home.  As with the tow truck, most cars are not easily used by persons who cannot stand or walk, and Plaintiff could not rely on his mother taking him home.

26.     While speaking to ACSC dispatchers, Plaintiff was afraid that he would experience the same lack of knowledge or assistance and repeat the terrible experience he endured in August 2015.  He spoke very clearly to the dispatcher and told her he was in a wheelchair and needed an accessible tow truck.  Plaintiff did not know that Defendants

only use the services of two accessible tow trucks for all of the Southern California region, and were not readily available for use by disabled members.  The Defendants' operator claimed she understood his request and offered to call him back after a few minutes to confirm his accessible tow.  When the operator called him back, she told Plaintiff there were no wheelchair accessible tow trucks available.  This dispatcher, although pleasant, did not offer him a wheelchair accessible taxi cab, but did ask if he any friends or family members to come take him home. Plaintiff did not want his wife to pick him up, as he did not want her worried, or upset that he had broken down again. Plaintiff's place of employment is near 54th street and Crenshaw in Los Angeles, and can be dangerous, especially at night.  It was already beginning to get late, and Plaintiff was afraid he and/or his car would be left in the parking lot after dark.  He did not want risk becoming a victim of violence, criminal activity, or for his car to get vandalized if it stayed there.  Furthermore, he did not want to be towed in his car again due to the pain and shaking he endured, and the lack of bladder control with the violent shaking.  His home was not close, and he feared it would be even more dangerous and humiliating to be hauled in his car.  He panicked and told the operator that he had a ride home when he did not, and asked her to send a regular tow truck as soon as she could so he could leave the area, and be sure his car was not left.

27.    When he agreed to an inaccessible tow truck, Defendants did send a tow truck that took his car to his home.  Plaintiff now found himself stranded in Los Angeles with no car.  He looked up the bus routes, as he could not afford a taxi, even if he could find an accessible taxi, and decided to go by bus.  Defendants did not offer him an accessible taxi, that they would pay for.  Since he had already experienced being towed in his car as the only offer, he did not ask for this "favor" again, and just said he had a ride. It had already taken Plaintiff approximately four hours from when he first called the

Defendants to when they towed his car.  It took him an additional two hours to return home on several busses.  Plaintiff did not arrive home until after 11:00 pm, by bus.

28.     Plaintiff was extremely frustrated that although he was a member in good standing, he was denied the prompt and safe wheelchair accessible services during two emergencies in a period of six months.  He called the Defendants' customer service phone number to lodge a complaint and to find out what the AAA policies were for ERS calls from disabled persons.  He spoke with a customer service representative and asked for an explanation of Defendants' policies for transporting disabled members when they need roadside assistance.  The representative told Plaintiff he could not tell him Defendants' policies regarding wheelchair accessible services for disabled members over the phone.  Instead, the representative offered to look into the matter and send him the policies by mail.  When Plaintiff wanted to discuss the problems he had during the January 2016 tow from the parking lot at his work, the representative refused to speak to him about this complaint, because he had used his mother's membership card.

29.     Plaintiff received a letter from Jamil Green, from the Defendants' "Member's Relations Group."  Mr. Green made a generic apology for the August 2014 ERS call, and claimed that "corrective action" had been taken.  The letter did not state what corrective action had been taken, and did not contain any information regarding Defendants' policies for providing ERS to disabled members who needed roadside assistance.  On information and belief, Defendants do not train, or provide employees or independent service providers with policies, or useable information for providing services to disabled members who may need alternative transportation during ERS calls.

30.     On information and belief, the Defendants deny disabled members the "full and equal" benefits and accommodations of its emergency roadside services because they are disabled, and require additional accommodations that Defendants have failed to provide.  Plaintiff requested ERS services to tow his car twice in a span of less than six

months.  On both occasions, Defendants failed to provide him with the services they claim to offer all members—safe and prompt ERS if they need a tow.  Additionally, Defendants have been sued twice in this Court alleging that Defendants have failed to provide their ERS services to disabled members in a full and equal manner.  As a result of Defendants' failure to offer their goods and services in full and equal manner to Plaintiff because he is a disabled member, he has been denied safe, prompt, and accessible transportation on two occasions when he needed his car towed.

31.    Plaintiff and other disabled members who require wheelchairs for mobility are unable to utilize Defendants' emergency roadside assistance services on a "full and equal basis" unless they are offered alternate transportation in a useable, functionally equivalent manner, as required by operation of law pursuant to Title III, 42 U.S.C. § 12181 *et seq.*; Department of Justice Regulations, 28 C.F.R. part 36; and California Civil Code § 51.  These laws were passed to ensure full and equal access for persons with disabilities in regards to goods and services offered by businesses to the general public. Plaintiff is a member of a protected class whose civil rights are protected by these statutes.  Defendants are business entities and own and/or operator public accommodations and are covered by the Unruh Act and Title III of the ADA.

32.    Plaintiff has been and will continue to be a member of the ACSC and AAA and will continue to require the goods and services offered by Defendants to general public, including accessible member services.

## V. CLAIMS FOR RELIEF
### FIRST CAUSE OF ACTION
### AMERICANS WITH DISABILITIES ACT – TITLE III
*(42 U.S.C. § 12101 et seq. and § 12181 et seq.)*

33.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

34.     In 1990, the United States Congress found that laws were needed to more fully protect some 43 million Americans with one or more physical or mental disabilities; that "historically, society has tended to isolate and segregate individual with disabilities;" that "such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;" that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals;" and that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous."  42 U.S.C. § 12101.

35.     Congress stated as its purpose in passing the Americans with Disabilities Act, 42 U.S.C. § 12101(b): "It is the purpose of this chapter:

1)  to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

2)  to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;

3)  to ensure that the Federal government plays a central role in enforcing the standards established in this act on behalf of individuals with disabilities; and

4)  to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities."

36.     As part of the ADA, Congress passed "Title III – Public Accommodations and Services Operated by Private Entities."  42 U.S.C § 12181 *et seq.*  Among "private entities" which are considered "public accommodations" for purposes of this title are

"insurance office" and a "shopping center, or other service establishments."  42 U.S.C. § 12181(7)(E) and (F).

37.    Title III of the ADA provides that "[i]t shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity."  42 U.S.C. § 12182(b)(1)(A)(i).

38.    As the owners, operators, contractors, and contractees of the services offered to the general public, Defendants have discriminated against Plaintiff on the basis of his disability in violation of Title III of the ADA and its implementing regulations.  The Defendants' discriminatory conduct includes, but is not limited to:

a) Discriminatory exclusion and/or denial of goods, services, facilities, privileges, advantages, accommodations, and/or opportunities on the basis of his disability;

b) Provision of goods, services, facilities, privileges, advantages, and/or accommodations that are not equal to those afforded non-disabled individuals due to his need for wheelchair accessible roadside assistance;

c) Failing to modify policies and procedures as necessary to ensure that persons with disabilities are provided full and equal access to the goods and services offered to the general public.

39.    Pursuant to the remedies, procedures and rights set forth in 42 U.S.C. § 12188 and 42 U.S.C. § 12205, Plaintiff prays for judgement as set forth below.

## SECOND CAUSE OF ACTION
## UNRUH CIVIL RIGHTS ACT
### *(Cal. Civ. Code § 51 et seq.)*

40.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

41.     THE AMERICAN AUTOMOBILE ASSOCIATION, INC.; AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA; and AUTO CLUB SERVICES, LLC. are business establishments, as such, must comply with the provisions of the Unruh Act, Cal. Civ. Code § 51, *et seq.*

42.     The Unruh Act guarantees, inter alia, that persons with disabilities are entitled to full and equal accommodations advantages, facilities, privileges, or services in all business establishments of every kind whatsoever within the jurisdiction of the State of California.  Cal. Civ. Code, § 51(b).

43.     The Unruh Act also provides that a violation of the ADA, or of California state accessibility regulations, is a per se violation of the Unruh Act.  Cal. Civ. Code, § 51(f).

44.     Defendants have violated the Unruh Act by, inter alia, denying, aiding, or inciting the denial of Plaintiff's rights to full and equal use of the accommodations, advantages, facilities, privileges, or services offered by the Defendants to disabled members of the Automobile Club of Southern California.

45.     Defendants have also violated the Unruh Act by violating Title II requirements to modify policies and procedures as necessary to ensure that persons with disabilities, including wheelchair users, are provided full and equal access to the goods and services offered to the general public as part of Defendants' ERS.

46.     On information and belief, Defendants have been aware of their failure to provide full and equal benefits ERS assistance to disabled members who cannot transfer into regular tow trucks, but have willfully, knowingly, and with intentionally

misrepresented the services offered to disabled members, and have failed to modify discriminatory practices necessary to provide full and equal services to disabled members who use wheelchairs, thereby causing physical pain, emotional distress.  The injury caused to Plaintiff and other similarly disabled members is solely on the basis of their disability of the members who cannot benefit or use the services offered to able-bodied members.

47.     Pursuant to the remedies, procedures, and rights set forth in Cal. Civ. Code § 52, Plaintiff prays for judgement as set forth below.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests:

1.     That this Court issue an injunction pursuant to the ADA and Plaintiff's related state law claims:

> a) Ordering Defendants to modify their policies, practices, and procedures to ensure full and equal access to their goods and services by persons with disabilities who require wheelchair accessible roadside assistance; and
>
> b) Prohibiting Defendants' from misrepresenting to disabled members that they may obtain ERS transportation services for disabled members, or to ensure that Defendants operate their ERS public accommodations and services in a full and equal manner to physically disabled persons, and requiring that such access be provided promptly.

2.     That this Court award general, compensatory, and statutory damages pursuant to the Unruh Act against all Defendants, in an amount within the jurisdiction of this court, for damages incurred by Plaintiff, and that these damages by trebled according to statute based on the knowing and willful continual misrepresentation and discrimination against disabled members who require accessible roadside assistance services in a manner equivalent to those offered to the general public;

ADA TITLE III: COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Case No.:                                                                                              19

3.      That this Court award special and consequential damages according to proof;

4.      That this Court award attorneys' fees, litigation expenses, and costs of suit, pursuant to Title III of the ADA, 42 U.S.C. § 12205; Cal. Civ. Code § 52; and Cal. Code of Civ. Proc. § 1021.5 for this important public benefit case; and

5.      Such other and further relief the Court may deem just and proper.


Dated: May 13, 2016.                    **BARBOSA GROUP**

By: _P Barbosa_

PATRICIA BARBOSA
AYMAN MOURAD
Attorneys for Plaintiff,
AURELIANO GALVEZ


## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury for all claims for which a jury is permitted.

Dated: May 13, 2016.                    **BARBOSA GROUP**

By: _P Barbosa_

PATRICIA BARBOSA
AYMAN MOURAD
Attorneys for Plaintiff,
AURELIANO GALVEZ